J-S15012-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| MATTHEW BRIAN WHITE | : | |
| | : | |
| Appellant | : | No. 860 WDA 2018 |

Appeal from the Judgment of Sentence May 11, 2018
In the Court of Common Pleas of Warren County Criminal Division at
No: CP-62-CR-0000273-2017

BEFORE: GANTMAN, P.J.E., SHOGAN, J., and COLINS*, J.

MEMORANDUM BY COLINS, J.: **FILED JULY 09, 2019**

Appellant, Matthew Brian White, appeals from the judgment of sentence of life imprisonment without the possibility of parole, which was imposed after his jury trial conviction for murder of the first degree.[1] We affirm.

On June 21, 2017, Appellant murdered his wife, Jessica White, by shooting her four times in the chest and abdomen. The murder took place in the driveway of their home while their three children – ages seven-years-old and younger – were inside the house.

_____

[1] 18 Pa.C.S. § 2501(a).

_____

\* Retired Senior Judge assigned to the Superior Court.

At 5:07 p.m. on that date, a "priority abandon" call[2] came into the Warren County 911 Center from the Whites' address. N.T. Trial at 60, 66, 79-80, 85-88, 97. When Pennsylvania State Police ("PSP") Trooper Shea Sedler arrived at the Whites' home, he observed Appellant and his wife ("Jessica" or "the Victim") seated in the passenger and driver seats, respectively, of a car parked in their driveway, both covered in blood; the trooper called for backup and emergency medical service ("EMS"). When PSP Corporal James Shaw arrived, he "cleared" the house, then spoke with Appellant and the Victim's seven-year-old child, B.W.

Appellant was transported via helicopter to the University of Pittsburgh Medical Center Hamot Specialty Center in Erie, where the trauma surgeon concluded that Appellant had a self-inflicted gunshot wound. *Id.* at 519, 609. Two days later, about two hours after Appellant was moved from the intensive care unit ("ICU"), Troopers Jeffrey Osborne and Scott Sipco went to Appellant's hospital room and had a conversation with him, which they recorded. Appellant was read his *Miranda*[3] rights and stated, "I don't even

---

[2] According to the lead telecommunicator for the Warren County Department of Safety, a "priority abandon" call "happens when a person dials 911 from a telephone, but hangs up before a 911 telecommunicator can answer the call." N.T. Trial at 66.

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

know what the hell happened." Appellant was charged with the murder of Jessica.

Prior to trial, the Commonwealth filed a petition to admit B.W.'s statements to Cpl. Shaw into evidence pursuant to the Tender Years Hearsay Act (TYHA).[4] On April 12, 2018, the trial court held a hearing on the petition.[5] At the TYHA hearing, Cpl. Shaw testified as follows:

_____

[4] An out-of-court statement made by a child victim or witness, who at the time the statement was made was 12 years of age or younger, describing any of the offenses enumerated in 18 Pa.C.S. Ch. 25 (relating to criminal homicide) . . . not otherwise admissible by statute or rule of evidence, is admissible in evidence in any criminal or civil proceeding if:

> (1) the court finds, in an in camera hearing, that the evidence is relevant and that the time, content and circumstances of the statement provide sufficient indicia of reliability; and
>
> (2) the child either:
>
> > (i) testifies at the proceeding; or
> >
> > (ii) is unavailable as a witness.

42 Pa.C.S. § 5985.1(a).

[5] TYHA requires that the hearing to determine the admissibility of a child's hearsay statements be conducted *in camera*. *Id.* § 5985.1(a)(1). There is nothing in the record to indicate that the TYHA hearing in the current action was conducted *in camera*, and, in fact, the cover of notes of testimony from that hearing states that it was conducted "in the Main Courtroom of the Warren County Courthouse[.]" N.T., 4/12/2018, at 1. However, neither party appears to have objected to the setting, and Appellant does not raise this setting as an issue on appeal.

[Q.] So, how many officers were on scene at the time that you got there?

A. I think when I got there, there was two or three on scene. . . .

Q. Where there any [emergency medical technicians] on scene at that time that you are aware of?

A. No, there were not. . . . I think, as I was arriving, a couple troopers were pulling [the Victim] out of the driver's seat of the car and started to perform CPR on her. . . . I believe there was like another Trooper in front of the cars. Like checking the back of that house. . . .

Q. Had anybody, to your knowledge, from law enforcement, cleared the house prior to your arrival?

A. No. I was the first one.

N.T., 4/12/2018, at 28-29. The corporal further testified that, although Appellant and the Victim's three children had been removed from the home while he was clearing the house, he "took the children back inside the house" "[a]fter we cleared the house," because it was "safe in there," whereas "there w[ere] two people outside that had . . . been shot." *Id.* at 32, 34. His testimony continued:

I asked [B.W.] if he could tell me what happened before his dad went outside. . . . He said, let me start from the beginning. My dad got off the phone. He seemed very upset, like he was starting to cry. He came over and hugged us kids, and kissed us. And, then said goodbye. . . . And he then left the residence. . . .

I asked him, too, if after his father went outside, if he heard anything. He said he heard something popping, like firecrackers outside.

- 4 -

*Id.* at 33.[6]  The corporal testified that his conversation with B.W. occurred at "probably 5:25 [or] 5:30 [p.m.] . . . less than a half hour" after the 911 phone call "came in[.]"  *Id.* at 34.

During cross-examination, Corporal Shaw described the scene as "calm as it could be" and acknowledged that "all the other personnel" were "safe at that point[.]"  *Id.* at 40.  Corporal Shaw was then asked his purpose in speaking with B.W.:

> Q.    All right.  So, you at that point were looking to gather evidence or information of what had occurred that day?
>
> A.    Correct. . . .
>
> Q.    Would you agree with me that there wasn't an ongoing emergency at that point, because the scene was secure?
>
> A.    I don't know.  I mean, there was still emergency.  They were still treating people outside.  You know.  Still.
>
> Q.    So, the purpose of you questioning [B.W.] was to gather further evidence to see what happened there?
>
> A.    To get information of what was, happened there that day. . . . Just to gather information, so we could see what we had.  You know, what we were looking for.  A suspect.  If he saw anybody else outside or any information he could give us to help us start investigating, you know, what happened to [Appellant] and [the Victim].
>
> Q.    So, it was for investigative purposes?
>
> A.    Yes.

_____

[6] At the TYHA hearing, Corporal Shaw additionally testified that B.W. told him he saw that "his mother and father were laying in the car and his mother was like flailing, and honking the horn."  *Id.* at 34.  However, this evidence was never presented to the jury at trial.  *Compare id. with* N.T. Trial at 97.

*Id.* at 41-42.

Upon being questioned directly by the trial court, Corporal Shaw clarified that there were two other troopers present in the house at the time he spoke to B.W. -- one who "might have been holding" one of B.W.'s siblings and another who "might have been holding [the other child's] hand or something." *Id.* at 43. Cpl. Shaw was the only person speaking to B.W. *Id.*

On re-direct examination, Corporal Shaw made clear: "when I first arrived on scene, really, all I knew, there was two people that had been shot outside the residence, you know, in the car, beside the car." *Id.* at 44. He further explained that, although the house itself was secure, the out buildings, back yard, and woods bordering the property had not yet been secured. *Id.* at 46-47.

At the conclusion of the hearing, the trial court determined that B.W.'s statements were nontestimonial and permitted the Commonwealth to introduce the statements at trial, through Cpl. Shaw. *Id.* at 76.

Additionally, prior to trial, Appellant filed a motion *in limine* to prevent the Commonwealth from admitting a text message written by Jessica to her mother ("Mother"). The text message at issue stated: "It's been decided. We are getting a divorce and I am pretty sure it's going to be messy." Commonwealth Exhibit 2. The message was sent May 29, 2017, which was Memorial Day, approximately one month before the Victim was killed. The

trial court denied the motion *in limine* and ruled that the text message was admissible to show motive.

At trial, Mother testified that she spoke to Jessica about the status of her marriage --

> Q.    The months and weeks prior to June 21st of [2017], did you speak with Jessica about the status of her marriage, the status of the Defendant, Matthew White?
>
> A.    Yes, I did.  Multiple times. . . . She said they were really struggling.  And, not getting along well.  Having arguments.  There was a lot of stress in the house.  She was worried about possibly getting a divorce.

N.T. Trial at 51.   After the Commonwealth introduced and the trial court admitted Commonwealth Exhibit 2, Mother's testimony continued:

> [A.]   [Jessica] was pretty well set that she was going to need a divorce.  To the point that I looked into some attorneys, and had given her an attorney's name. . . .
>
> Q.    Prior to this, had Jessica discussed with you anything about her divorce or separating or anything like that?
>
> A.    She had talked about things not going real well.  The home life being very stressful, and she was worried about her marriage. . . . She did talk to me saying that she wanted, that she was hoping that she would be able to stay in the house and have Matthew move out.  That way the kids weren't disrupted.  They would still be in their same home.

N.T. Trial at 54-55.

Appellant also took the stand.  After agreeing that he and the Victim had discussed divorce "on Memorial weekend[,]" *id.* at 554, Appellant testified that two masked men killed his wife and shot him.  Specifically, Appellant testified that, beginning at 5:01 p.m. at the earliest, he was outside on the porch, went back inside to check on his children, heard shots,

- 7 -

ran outside, struggled with one of the masked men, ran around the back of the house, was shot, fired shots, and laid down for approximately five minutes before going into the house while covered in blood to call 911 at 5:07 p.m.

During cross-examination, the following dialogue took place between the Commonwealth and Appellant:

Q.     You didn't tell her that you thought she . . . is cheating on you with guys at work?

A.     I suspected that.  But, I didn't know.

Q.     And, you told her that, right?

A.     Yeah.

*Id.* at 581.   Appellant then agreed with the majority of Cpl. Shaw's testimony about B.W.'s statement:  that he hung up the telephone, was crying, gave the children a hug and a kiss, told them he loved them, said goodbye, and went outside.  *Id.* at 584-85.  The following exchange then occurred:

Q.     Do you have any idea who these masked men are?

A.     I have an idea but. . . .

Q.     What [are] their names?

A.     I would rather not state their names right now on the record.

Q.     They killed your wife.

A.     Exactly.  Why didn't you come and ask me this before[?]

Q.     What, say that again?

A.     No cop ever –

Q.    Say, say that again, why what?

A.    No, why didn't you guys come and ask me this before? Nobody came and asked me who did this.

Q.    I am glad you asked me that. You don't remember being in the hospital on June 23rd and having this (Indicating) gentleman back here and another Trooper come and ask you what happened? . . . And you responded to them, I don't know what the hell happened. I can't tell you anything?

A.    I couldn't believe you were charging me. Yes, did you record that?

Q.    Actually we did. Actually we did. . . . Would you like to hear?

A.    I don't care. . . . They would have investigated and found out. . . .

Q.    How did [the troopers] treat you? . . .

A.    Very rudely. . . . I can't remember anything they said.

Q.    You don't remember that?

A.    But, I always know that if you are charged with [a] crime not to freakin say anything.

. . .

Q.    What you told them was, I don't have any idea what happened, isn't that true?

A.    Yes. But I did tell. I did tell a doctor that

. . .

[Q.] Basically, you said, why didn't someone ask you what happened. And, I, we went to June 23rd, two days after the incident, when you are in the hospital.

I believe you are in the hospital still. Under guard. And the two troopers came in and asked you what happened. And, you told them, I don't know what the hell happened. And, that's because they were rude to you?

A.    Yes. . . . I[f] you would've asked me this ten or eleven months ago. I don't know what to say.

*Id.* at 606-10, 613, 630-31.

During Appellant's re-direct examination, the following exchange about

the interrogation of Appellant while he was in the hospital occurred:

> Q. [Trooper Osborne] is trying to ask you what happened?
>
> A. That's to my knowledge. I am not sure how it went down. I would like to see the video.[7]
>
> Q. But, you are arrested once. You are arrested, and you don't want to talk to him, because you are under arrest?
>
> A. Right. Exactly. Yep. I was always told never to, if they arrest you, to never say anything until they, till court.

*Id.* at 637-38.

Based on Appellant's statement "I would like to see the video[,]" *id.* at

637, the Commonwealth sought to introduce the recording. *Id.* at 639. At

side bar, defense counsel informed the trial court that, on the recording,

Appellant "assert[ed] the Constitutional rights. He said he didn't want to

talk to them. He asserted that right." *Id.* at 639. The trial court answered

that it was "fine" to play those statements and allowed the Commonwealth

to broadcast the recording in open court. *Id.* at 639-40. The recording[8]

contained the following relevant excerpts --

---

[7] At this time, Appellant mistakenly believed that the recording was a video, whereas it was actually an audio recording only.

[8] The recording itself was not initially included with the certified record, and no transcript thereof was provided by either party. Our Prothonotary obtained the recording from Warren County, and we transcribed the excerpts included herein.

Appellant:[9]  Don't know anything to say.

Trooper Sipco:    I'm Trooper Sipco at the Pennsylvania State Police currently at Hamot Hospital, Room 440.  The date's June 23, 2017.  Time is approximately 14:35 hours.  Here with Matthew White and Trooper Osborne.  Are you aware you are being recorded, Matthew?

Appellant:  Yes.

. . .

Trooper Osborne:      Just so everybody understands, Matt, you have a gunshot wound to your chest, I mean that's, basically correct me if I'm wrong at any time, but that seems to be – that's why you're here, is that correct, why you're here at Hamot?  O.K.?  Like Trooper Sipco said, what we want to do is - and, unfortunately, I have to tell you again and again for anyone who is listening - your wife did not make it, O.K.?  And that's why we are here, O.K., because we want to figure out what happened to you and what happened to her.

Appellant:  My kids O.K.?

Trooper Osborne:      Your kids are perfectly fine.  O.K., you got nothing to worry about with the kids right now.  But we want to figure out exactly what happened, (Appellant moans) figure out what you can tell us.  Every detail you can possibly remember, O.K.?  (Appellant moans).

     You understand that?  That's why we are here.  Matt, do you understand that?

Appellant:  Yes, I do.  I … I …

Trooper Osborne:      O.K.  One thing I am going to do, and it has nothing to do with you, it's to protect you, and it protects us.  O.K.  I'm gonna read you your rights.  Have you ever had your rights read to you before?

. . .

---

[9] The recording begins with Appellant's statement, with nothing directly preceding it.  Commonwealth Exhibit 62.

> *[**Miranda** rights are read.]*
>
> Appellant: I'm gonna wait to hell call in an attorney,[10] because I don't -- **I don't even know what the hell happened**.
>
> Trooper Osborne:   O.K. and then that's why I read you your rights, O.K. Um, if you're telling me right now and that's what you're telling me, I want to make sure that's 100% accurate, that you're telling me that you don't want to talk to me right now, you want to talk to an attorney before you talk to us is that correct?
>
> Appellant: Yes.
>
> Trooper Osborne:   O.K.
>
> Trooper Sipco:   This interview will be concluded at 14:40.

Commonwealth Exhibit 62 (emphasis added).

Appellant was found guilty of murder of the first degree and sentenced to life imprisonment without the possibility of parole on May 11, 2018. On June 1, 2018, Appellant filed this timely direct appeal.[11]

---

[10] As noted above, neither party provided a transcript of the audio recording at issue, and this Court transcribed the recording. We found part of Appellant's response immediately after Trooper Osborne finished reading the **Miranda** rights to him difficult to discern – specifically, the section that we have transcribed as "to hell call in." Nevertheless, we believe that our perception of the words "I'm gonna wait" and "attorney" are correct, as is everything after "because."

[11] Appellant filed his statement of errors complained of on appeal on June 4, 2018, although one was not ordered by the trial judge. The trial court entered its opinion on July 24, 2018. Additionally, Appellant attached the wrong trial court docket to his notice of appeal; he attached the docket for CP-62-CR-0000496-2001. The trial court added that docket number to this appeal. Appellant filed an amended notice of appeal with the correct trial court docket attached. Appellant is only filing an appeal from CP-62-CR-
*(Footnote Continued Next Page)*

Appellant presents the following issues for our review:

1. Did the trial court commit reversible error in permitting the Commonwealth to play for the jury an audio recording of a custodial interrogation where Appellant asserted his right to remain silent and invoked his right to counsel?

2. Did the trial court commit reversible error in admitting the hearsay statement of the minor child when it was testimonial and the Appellant did not have an opportunity to cross-examine the witness?

3. Did the trial court commit reversible error in admitting the hearsay text message of the victim?

Appellant's Brief at 3 (renumbered to facilitate disposition).

**Audio Recording of Interrogation**[12]

Appellant contends that the trial court erred in permitting the Commonwealth to play for the jury an audio recording of the interaction between Appellant and state troopers, on June 23, 2017, when Appellant was at the hospital.[13]  Appellant argues that the conversation was a

_(Footnote Continued)_ ─────────────

0000273-2017, therefore, **Commonwealth v. Walker**, 185 A.3d 969 (Pa. 2018), is not implicated.

[12] As Appellant does not point to any questions asked by the prosecutor as impermissibly commenting on Appellant's post-arrest silence, our analysis is limited to the error complained of by Appellant, the introduction of the recording, which includes the statement by Appellant:  "I'm gonna wait to hell call in an attorney, because I don't - I don't even know what the hell happened." Commonwealth Exhibit 62.

[13] We note that defense counsel never formally objected to the admission of the audio recording during trial, and the trial court never explicitly stated that it was overruling any objection.  However, we will consider the exchange at side bar transcribed at N.T. Trial at 639 to be sufficient to have
_(Footnote Continued Next Page)_

- 13 -

custodial interrogation and that he asserted his right to remain silent, and any reference to his silence therefore was reversible error per *Commonwealth v. Turner*, 454 A.2d 537 (Pa. 1982).

"No person . . . shall be compelled in any criminal case to be a witness against himself . . ." U.S. Const. Amend. V. The right against self-incrimination includes the right of a criminal defendant not to testify at trial, and the right to remain silent as explained in the *Miranda* cases. Additionally, the Supreme Court of Pennsylvania has held that the prosecution cannot impeach a testifying criminal defendant with his post-arrest silence, because an accused has a legitimate expectation that no penalty will attach to a lawful exercise of his constitutional right to remain silent, whether *Miranda* warnings are given or not. *Turner*, 454 A.2d at 540.

An appellant court's review of a constitutional right issue is a question of law; therefore the standard of review is *de novo* and the scope of review is plenary. *Commonwealth v. Baldwin*, 58 A.3d 754, 762 (Pa. 2012).

Preliminarily, we must determine whether Appellant was under arrest or otherwise in custody at the time the interrogation was recorded, because, as mentioned above, *Turner* only pertains to the **post-arrest** silence of the

*(Footnote Continued)* ────────────────

preserved this issue. We further note that defense counsel also never requested a curative instruction.

- 14 -

accused. 454 A.2d at 540; ***see also Commonwealth v. Bolus***, 680 A.2d 838, 843-44 (Pa. 1996) (defendant was interviewed prior to his arrest and made several statements to law enforcement inconsistent with his trial testimony; Supreme Court held ***Turner*** is only relevant to post-arrest silence; when a defendant chooses to testify, he waives his Fifth Amendment protection and is subject to impeachment through reference to pre-arrest silence); ***Commonwealth v. Fischere***, 70 A.3d 1270, 1280 (Pa. Super. 2013) (*en banc*) (admission of evidence of pre-arrest silence is subject to a more lenient standard than post-arrest silence; in order for evidence of pre-arrest silence to be admissible, defense must "open the door," and the trial court assess probative value versus prejudicial effect; defense counsel opened the door when, "through no provocation from the Commonwealth," it "engaged in a line of questioning that inquired into why law enforcement did not conduct a more comprehensive interview with Appellant"; the probative value of Appellant's silence was to show "that Appellant's refusal to speak to the officers . . . limited law enforcement's ability to conduct the full investigation that defense counsel was insinuating should have been conducted"); ***Commonwealth v. Moury***, 992 A.2d 162, 176 (Pa. Super. 2010) ("To run afoul of ***Turner***, it must be clear that the testimonial reference is to post-arrest silence." (quoting ***Commonwealth v. Mitchell***, 839 A.2d 202, 213 (Pa. 2003)).

Appellant contends that "the circumstances are . . . compelling that [he] would conclude he was in custody and could not freely leave." Appellant's Brief at 25. He continues that this "custodial interrogation" began "upon the officers' arrival at his room[.]" *Id.* at 26. Appellant relies upon *Commonwealth v. Whitehead*, 629 A.2d 142, 144 (Pa. Super. 1993), where this Court found that a reasonable person being questioned while in a hospital bed or gurney would conclude that he was in custody, as he could not leave freely. Appellant's Brief at 24.[14]

The Supreme Court of Pennsylvania has "defined an arrest as any act that indicates an intention to take the person into custody and subjects him to the actual control and will of the person making the arrest." *Commonwealth v. Lovette*, 450 A.2d 975, 978 (Pa. 1982). Examples of such acts may include placing physical or verbal restraints upon a person or giving him the *Miranda* warnings. *Commonwealth v. Monahan*, 549 A.2d 231, 234 (Pa. Super. 1988).

> The test is an objective one, i.e., viewed in the light of the reasonable impression conveyed to the person subjected to the seizure rather than the strictly subjective view of the officers or the persons being seized.
>
> Finally, whether an encounter is to be deemed 'custodial' must be determined with reference to the totality of the circumstances.

_____

[14] The Commonwealth presents no argument as to whether Appellant was in custody or under arrest at the time of the audio recording at issue and thus appears to concede the point. Commonwealth's Brief at 13-18.

***Id.*** (citations omitted) (some formatting).

In the current case, Appellant was in the hospital, having just been moved from the ICU two hours before, and could not leave freely. ***Compare*** N.T. Trial at 609 ***with Whitehead***, 629 A.2d at 144. He was then read his ***Miranda*** rights. ***Compare*** Commonwealth Exhibit 62 ***with Monahan***, 549 A.2d at 234. Ergo, we conclude that, based upon the totality of the circumstances, the reasonable impression conveyed to Appellant was that he was being taken into custody.[15] ***See Lovette***, 450 A.2d at 978; ***Monahan***, 549 A.2d at 234. Accordingly, his statements on the recording were made post-arrest, and the ***Turner*** standard applies. ***See Turner***, 454 A.2d at 454; ***see also Bolus***, 680 A.2d at 843-44; ***Fischere***, 70 A.3d at 1280; ***Moury***, 992 A.2d at 176.

Appellant claims that playing the recording was an impermissible comment on his post-arrest silence, because he was heard stating, "I'm gonna wait to hell call in an attorney, because I don't - I don't even know what the hell happened." Commonwealth Exhibit 62. We disagree and find that, in the context the recording was presented, Appellant's Fifth Amendment rights were not violated.

---

[15] Although "[t]he test is an objective one[,]" ***Monahan***, 549 A.2d at 234, we observe that Appellant testified that he believed that he was being placed under arrest at the time the audio recording was made. ***See*** N.T. Trial at 613, 637.

In **Commonwealth v. Copenhefer**, 719 A.2d 242, 251 (Pa. 1998), the defendant alleged the prosecutor improperly commented on his post-arrest silence when the prosecutor challenged his testimony **about the police investigation**. The Supreme Court explained:

> In general, after a defendant has been given **Miranda** warnings, the defendant's post-arrest silence may not be used against him to impeach an explanation subsequently offered at trial. However, where a prosecutor's reference to a defendant's silence is a fair response to a claim made by defendant or his counsel at trial, there is no violation of the Fifth Amendment privilege against self-incrimination. . . . Appellant may not assert to a jury that on the one hand he was entirely cooperative with investigators but on the other hand not place before that same jury the fact that he belatedly invoked his right to remain silent to refuse to answer the most incriminating questions put to him. Not only would such a situation be misleading to the factfinder, but it would allow appellant to convert the Fifth Amendment shield into a sword which could not be countered by the prosecutor's further inquiry or fair comment thereon. Accordingly, we find that the prosecutor's comments were a fair response to a claim made by defendant or his counsel; thus, the comments did not violate appellant's Constitutional rights.

**Id.** at 251-52 (internal citations and quotation marks omitted).

Just like the defendant in **Copenhefer**, **id.** at 252, Appellant implied to the jury that he would have been cooperative with investigators and blamed the police for a conducting a poor investigation by not asking him appropriate questions. N.T. Trial at 607-08 ("Why didn't you come and ask me this before . . . No cop ever -- . . . why didn't you guys come and ask me that before? Nobody came and asked me who did this. . . . They would have investigated and found out."). Therefore, as with the defendant in **Copenhefer**, 719 A.2d at 252, Appellant cannot be permitted to preclude

the Commonwealth from placing before the same jury the fact that he refused to cooperate with said investigators and invoked his right to remain silent, declining to answer the potentially incriminating questions that he was now claiming they never asked him. Thus, the Commonwealth's playing of the audio recording referencing Appellant's post-arrest silence, Commonwealth Exhibit 62, was a "fair response to a claim made by defendant or his counsel at trial" **about the nature of the investigation** and thereby was not a "violation of the Fifth Amendment privilege against self-incrimination." *Copenhefer*, 719 A.2d at 251.

Furthermore, the cases relied upon by Appellant in his brief to this Court are nondispositive. Appellant first relies upon *Turner* itself. Appellant's Brief at 26. Although we apply the test from *Turner*, the facts of *Turner* itself are also distinguishable from the current action. In *Turner*, 454 A.2d at 538-39, at trial, the defendant, for the first time, stated that his shooting of the victim had been in self-defense. During cross-examination, the prosecutor inquired as to why the defendant had never told the police that someone had been shooting at him on the night of the murder. *Id.* On appeal the Supreme Court of Pennsylvania reversed, holding that, in cases in which the defendant offers his version of the events for the first time at trial – *i.e.*, where he had never made a statement to the police, the prosecution is not permitted to impeach the defendant's testimony by reference to the defendant's previous silence, *id.* at 540, explaining:

- 19 -

> the Commonwealth must seek to impeach a defendant's relation of events by reference only to inconsistencies as they factually exist, not to the purported inconsistency between silence at arrest and testimony at trial. Silence at the time of arrest may become a factual inconsistency in the face of an assertion by the accused while testifying at trial that he related this version to the police at the time of arrest when in fact he remained silent.

*Id.* at 539-40.

In the current action, as in **Turner**, Appellant, for the first time, stated that he saw someone else shoot Jessica. **See id.** at 539. Unlike in **Turner**, however, it was not the **prosecutor** who inquired as to why the defendant had never told police this information, **see id.**, but **Appellant** who ask why he was never asked by police for this information, N.T. Trial at 607 ("Why didn't you come and ask me this before"), and who asked to have the recording played. **Id.** at 637 ("I would like to see the video."). **See also Wainwright v. Greenfield**, 474 U.S. 284 (1986) (officers' testimony – not prosecutor's comments or questions – about the defendant's response to the **Miranda** warnings was held to violate the defendant's Fifth Amendment rights). The facts of **Turner** are consequently distinguishable to those of the current appeal.

Appellant likewise relies upon **Commonwealth v. Freeman**, 562 A.2d 375 (Pa. Super. 1989). Appellant's Brief at 27-28. In **Freeman**, the prosecutor asked the appellant if he "ever gave the police [his] version of what happened, or try to give them [his] version?" 562 A.2d at 377. Upon review of the appellant's trial testimony, this Court "found no indication that

appellant ever asserted that he told his version of the incident to police at the time of his arrest." *Id.* This Court concluded: "Because appellant made no claim that he related his version at the time of arrest, appellant's post-arrest silence is not 'factually inconsistent' with his testimony at trial, and the trial court should not have permitted inquiry in this area." *Id.*

Unlike *Freeman*, where the appellant did not make **any** statement to police and consequently the issue concerned his post-arrest **silence**, 562 A.2d at 377, Appellant in the current appeal did not remain silent but, instead, told police he did not know what happened. Commonwealth Exhibit 62. Additionally, Appellant testified that no one asked him what happened during the shooting. N.T. Trial at 607. This testimony was "factually inconsistent" with the recording where Trooper Osborne asked Appellant what happened to him and Jessica. Commonwealth Exhibit 62. Appellant's assertion during trial that he knew who killed Jessica was also "factually inconsistent" with his statement on the recording that he did not know anything. **Compare** N.T. Trial at 607 **with** Commonwealth Exhibit 62. For all these reasons, *Freeman* is not controlling.

In conclusion, we find the circumstances of **Copenhefer** the most analogous to those of the current case, and we therefore hold that, as in **Copenhefer**, 719 A.2d at 252, the playing of the audio recording was a fair response to Appellant's claim that investigators never asked him about the shooting, whereas the cases cited by Appellant, **Freeman** and **Turner**, are

inapposite. Hence, Appellant's Fifth Amendment right against self-incrimination was not violated when the trial court allowed the Commonwealth to introduce the recording into evidence. Appellant's first issue on appeal is thereby meritless.

### Admission of B.W.'s Statements to Police

Appellant next argues that introduction of the hearsay statements of B.W. *via* the trial testimony of Corporal Shaw violated Appellant's right to confront witnesses against him under the Sixth Amendment. Appellant's Brief at 10.

"[W]hether a defendant has been denied his right to confront a witness under . . . the Sixth Amendment . . . is a question of law, for which our standard of review is *de novo* and our scope of review is plenary." ***In re N.C.***, 105 A.3d 1199, 1210 (Pa. 2014).

The Sixth Amendment guarantees that, "in all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. Amend. VI. "The Confrontation Clause . . . prohibits out-of-court **testimonial** statements by a witness unless the witness is unavailable and the defendant had a prior opportunity for cross-examination." ***Commonwealth v. Yohe***, 79 A.3d 520, 531 (Pa. 2013) (emphasis added).

Thus, we must first consider whether B.W.'s statements to Corporal Shaw immediately follow the "clearing" of the Whites' home by the police were "testimonial statements." ***See id.***

Appellant argues that B.W.'s on-scene statements to the police were testimonial. Appellant's Brief at 10.

> [I]n analyzing whether a statement is testimonial, and, therefore, subject to the protections of the Confrontation Clause . . . , a court must determine whether the primary purpose of the interrogation was to establish or prove past events relevant to a later criminal prosecution. In making the determination as to the primary purpose of an interrogation, a court first should determine whether the interrogation occurred during the existence of an ongoing emergency, or what was perceived to be an ongoing emergency. Although the existence—actual or perceived—of an ongoing emergency is one of the most important factors, this factor is not dispositive because there may be other circumstances, outside of an ongoing emergency, where a statement is obtained for a purpose other than for later use in criminal proceedings. In determining the primary purpose of an interrogation, a court must also objectively evaluate the circumstances surrounding the interrogation, including the formality and location, and the statements and actions of both the interrogator and the declarant.

***Commonwealth v. Allshouse***, 36 A.3d 163, 175–76 (Pa. 2012).

We will examine each factor in turn. As the trial court rendered its decision about the admission of B.W.'s hearsay statements after the pretrial hearing mandated by TYHA, 42 Pa.C.S. § 5985.1(a)(1), on April 12, 2018, we will only consider the evidence presented during that hearing for our review of this issue. The trial court only had that information available to it when it rendered its decision, not the evidence presented during trial, similar to how "as a matter of law our scope of review in suppression matters is

limited to the suppression hearing record, and excludes any evidence elicited at trial." **Commonwealth v. Yong**, 177 A.3d 876, 883 (Pa. 2018), *cert. denied*, 139 S. Ct. 374 (2018).

*Ongoing Emergency*

In order to determine whether there was an ongoing emergency or a perceived emergency, the focus must be on the perspective of the parties at the time of the interrogation and not based on hindsight, for "[i]f the information the parties knew at the time of the encounter would lead a reasonable person to believe that there was an emergency, even if that belief was later proved incorrect, that is sufficient for purposes of the Confrontation Clause." **Allshouse**, 36 A.3d at 174. Whether an emergency exists and is ongoing is a highly context-dependent inquiry, and the duration and scope of an emergency may depend in part on the type of weapon employed. **Michigan v. Bryant**, 562 U.S. 344 (2011).

Appellant contends that, "[a]t the time the child was questioned, there was not an ongoing emergency under an objective standard." Appellant's Brief at 13. He continues:

> B.W. was not questioned immediately upon the arrival of police to the scene and instead approximately a half an hour had passed before they sat down to talk with him. By the time Corporal Shaw questioned B.W., the home had been searched, cleared, and secured by the police. [N.T., 4/12/2018, at 33-35.] Corporal Shaw acknowledged that the house was safe and that was why he had returned the children inside before talking to B.W. [*Id.* at 32.] . . . [Corporal Shaw] agreed that although unpleasant, the scene was calm at the point he began questioning B.W. [*Id.* at 40.]

- 24 -

*Id.* at 13-14.

We conclude there was an ongoing emergency based on several facts. Corporal Shaw testified that his conversation with B.W. occurred "**less than a half hour**" after the 911 call, N.T., 4/12/2018, at 34 (emphasis added), contrary to Appellant's contention that a full half hour had elapsed. Appellant's Brief at 13. More importantly, although Appellant is correct that Corporal Shaw referred to the home as "safe[,]" Appellant's Brief at 13 (citing N.T., 4/12/2018, at 40), the out buildings, back yard, and surrounding woods had not yet been secured. N.T., 4/12/2018, at 46-47. A gun was used in the crime, as in *Bryant*, further suggesting an emergency existed and was ongoing. *Compare* N.T., 4/12/2018, at 34 *with* 562 U.S. 344.

As for Appellant's argument that Corporal Shaw stated that "the scene was calm," Appellant's Brief at 13 (citing N.T., 4/12/2018, at 40), the corporal actually stated that the scene was "calm as it could be[.]" N.T., 4/12/2018, at 40. This statement is ambiguous, because he could have meant that the situation was as calm as anything could ever be **or** as calm as the scene of a murder investigation could possibly be, all things considered. In context, the latter interpretation makes more sense, because when Cpl. Shaw arrived on the scene, no EMS personnel were present and another trooper was pulling Jessica out of the driver's seat and starting to perform CPR. *Id.* at 28-29. Finally, we note that at the time he arrived,

Cpl. Shaw only had information that two victims were shot. **Id.** at 44. For these reasons, we find the existence of an ongoing emergency -- or what was perceived to be an ongoing emergency -- at the time Corporal Shaw spoke with B.W. **See Allshouse**, 36 A.3d at 175.

### Circumstances Surrounding the Interrogation

Next, we will discuss the formality of the interrogation and the location. **See id.** The interrogation occurred in B.W.'s home. N.T., 4/12/2018, at 32. The conversation happened immediately after Cpl. Shaw had completed clearing the house, less than a half hour after receiving the 911 call. **Id.** at 34. There were two other troopers present in the house at the time Cpl. Shaw spoke to B.W. -- one who "might have been holding" one of B.W.'s siblings and another who "might have been holding [the other child's] hand or something." **Id.** at 43. Cpl. Shaw was the only person speaking to B.W. **Id.** We conclude that the questioning by Cpl. Shaw was informal based on the location of the questioning in B.W.'s house, at the scene of the emergency, with two other troopers present but tending to the two other small children.

### Actions and Words of Corporal Shaw

As for "the statements and actions of . . . the interrogator[,]" **Allshouse**, 36 A.3d at 176, the questioning occurred at the scene of the emergency, immediately after Cpl. Shaw completed clearing the house. N.T., 4/12/2018, at 32, 34. Cpl. Shaw brought the children back inside the

house, *id.* at 32, and asked B.W., the oldest child, what happened in order "to gather information," to see "what [they] were looking for[,]" such as "[a] suspect[,]" and "[i]f he saw anybody else outside or any information he could give [them] to start investigating . . . what happened to" Appellant and Jessica. *Id.* at 42.

Appellant is suggesting that, since B.W. was not questioned immediately upon police arrival, the statement was made in furtherance of future prosecution. Objectively viewing the circumstances, Cpl. Shaw was the first person able to speak to B.W. *Id.* at 29. There is no indication the other troopers knew there were children in the home. The first responding trooper, Trooper Sedler, could not have questioned B.W. as he was attending to Appellant and the Victim. *Id.* Additionally, at least one other trooper was helping him with the Victim, and another trooper was checking the immediate exterior of the home. *Id.* Cpl. Shaw was the first on the scene to go into the house to determine if there was a potential suspect inside. *Id.*

Appellant characterizes Cpl. Shaw's question to B.W. about what happened before Appellant went outside, *id.* at 33, as a clear intent to gather information to build the case against Appellant; we do not agree. Cpl. Shaw only knew that two victims were shot upon arriving at the scene. *Id.* at 44. The question was posed to a seven year old and did not appear to implicate Appellant, but it was directed to the child and asked what, if

anything, the child observed Appellant doing in the house before going outside, as the children were inside while Appellant was found outside in the car. *Id.* at 33.

Additionally, Appellant's focus on the specific question or questions asked by Cpl. Shaw is inconsistent with the *Bryant* Court's reminder that "it is the statements, and not the questions that must be evaluated under the Sixth Amendment." 562 U.S. at 367 n.11.

*Actions and Words of B.W.*

We must also consider the statements and actions of B.W. during his interview with Cpl. Shaw to determine whether his primary purpose in making the statements was to establish past events for use during a subsequent criminal prosecution. *See id.* at 367 (the statements and actions of both the declarant and interrogators provide objective evidence of the primary purpose of the interrogation).

We find that Appellant's age is informative. An assessment of whether or not a reasonable person in the position of the declarant would believe a statement would be available for use at a later trial involves an analysis of the expectations of a reasonable person in the position of the declarant. *Allshouse*, 36 A.3d at 181. Expectations derive from circumstances, and, among other circumstances, a person's age is a pertinent characteristic for analysis. *Id.* We find that B.W.'s statement is not one that a seven year old would have made with the purpose of it being used in the future prosecution

of his own father. B.W. did not state "I saw my father shoot my mother"; in fact, his statements were not even close to an outright implication of his father in any crime. B.W. would have to understand the nature of circumstantial evidence to know that what he said could potentially be relevant in a later prosecution of his own father, which, based on his statements, is not a reasonable expectation. Additionally, B.W. did not state that he saw what happened. He described an interaction with his father, in his home, that did not appear on the surface to be in any way related to a crime. These are not statements a seven year old would make with the purpose for use in a future prosecution.

\*     \*     \*

Upon consideration of the above factors, we find that the statements made by B.W. to Cpl. Shaw were nontestimonial.[16] The statements occurred during an ongoing emergency, were informal, and made at the scene of the emergency; the actions and statements of both Cpl. Shaw and B.W. indicate the questions and answers were made to help assist in an ongoing emergency.

---

[16] As we find that B.W.'s statements were nontestimonial, we need not address the other requirements of admissibility – *i.e.*, whether "the witness is unavailable" and whether "the defendant had a prior opportunity for cross-examination." *Yohe*, 79 A.3d at 531. Nevertheless, we observe that Appellant "did not advance an argument concerning the minor's availability, and the [trial c]ourt deemed that the minor was unavailable." Trial Court Opinion, filed July 24, 2018, at 3.

As B.W.'s statements were nontestimonial, they were not barred by Appellant's right to confront the witness against him. ***See Yohe***, 79 A.3d at 531; ***Commonwealth v. Williams***, 103 A.3d 354 (Pa. Super. 2014) (nontestimonial statements are not barred by defendant's right to confront the witness against him).

**Admission of the Text Message**

Next, Appellant argues that the trial court erred in admitting the text message sent by the victim to her mother regarding her impending divorce, because it was inadmissible hearsay and violated Appellant's right to confrontation of a witness.

> The [trial c]ourt found that the text messages were admissible under the exception to the rule against hearsay for present state of mind at Pa.R.E. 803(3).[17]  Generally, out of court statements by homicide victims are admissible when they are relevant to show proof of motive or malice.  The [trial c]ourt found that the text messages were relevant to show motive or malice on the part of [Appellant].  The marital difficulties experienced by [Appellant] and the victim were a possible motive which the jury could weigh along with all the other evidence presented.

---

17  The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness: . . . A statement of the declarant's then-existing state of mind (such as motive, intent or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will.

Pa.R.E. 803(3).

- 30 -

Trial Court Opinion, filed July 24, 2018, at 4 (citations omitted).

In reviewing the admissibility of the evidence, our standard of review

is as follows:

> An appellate court's standard of review of a trial court's evidentiary rulings, including rulings on the admission of hearsay ... is abuse of discretion. Thus, we will not disturb an evidentiary ruling unless the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by evidence of record.

*Commonwealth v. Fitzpatrick*, 204 A.3d 527, 531 (Pa. Super. 2019),

*reargument denied* (Apr. 23, 2019) (citations and quotation marks omitted).

> Not all errors at trial, however, entitle appellant to a new trial, and the harmless error doctrine, as adopted in Pennsylvania, reflects the reality that the accused is entitled to a fair trial, not a perfect trial. . . . Harmless error exists when the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence.

*Commonwealth v. Reese*, 31 A.3d 708, 719 (Pa. Super. 2011) (citations

omitted).

We find the statement was hearsay and not admissible under the state

of mind exception, as "I think it's going to be messy" is a statement of belief

being offered to prove the fact believed and is expressly excepted from

Pa.R.E. 803(3). Although the statement would be admissible as non-

hearsay to prove Appellant's malice or ill will, counsel for the Commonwealth

argued that the divorce was going to be messy in his closing argument, and

we therefore must conclude it was being offered to prove the truth of the matter asserted.

However, the statements were merely cumulative of other evidence adduced at trial. There was no dispute that Appellant and the Victim were discussing divorce, which Appellant himself corroborated; he also acknowledged that he suspected the Victim of having affairs. N.T. Trial at 554, 581. Mother additionally testified that she regularly spoke to the Victim about the status of her marriage, including that Appellant and the Victim were "struggling[,]" "not getting along well[,]" and considering divorce. *Id.* at 51, 54-55. Thus, the phrase "it's going to be messy" was merely cumulative of other evidence presented that Appellant and Jessica were having marital issues and discussing divorce, and "erroneously admitted evidence that is merely cumulative of other untainted evidence is harmless error." *Commonwealth v. Koehler*, 737 A.2d 225, 237 (Pa. 1999); *see also Allshouse*, 36 A.3d at 182 (concluding that erroneous admission of cumulative evidence was harmless). Accordingly, any error in the admission of the Victim's hearsay statement was harmless.

Based on the foregoing, Appellant is not entitled to relief.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/9/2019